FRANK P. GALE ET UX., APPELLANTS, VS. CHARLES S. HARBY ET ALS., APPELLEES.

1 Trusts arising under a will are express trusts to be controlled and interpreted under the terms of the will.

2. Where, by a will, a portion of the property is devised or bequeathed to certain of the grandchildren of the testator, with directions to his executors to hold it in trust for and to use and control it for the interest of the grandchildren until they should marry or become of lawful age, when it was to be divided among them, the mother of such grandchildren acquires no interest in the property.

3. Parol testimony is admissible to show that the grantees in a deed of conveyance of land absolute on its face, purchased as trustees, with a knowledge of the trust, that the cash paid at the time of the purchase was money realized from the sale of the trust property, and that subsequent payments of the balance of purchase money due was money realized from the use of the property purchased with the trust fund. A purchase with trust funds is virtually

a purchase paid for by the *cestui que trust*. Such a purchase is a trust by operation of law not within the statute of frauds, and the fund may be followed so long as its general character can be identified. Where the grantees admitted the trust, and that the purchase was made with trust funds, as well as that they held as trustees, the trust arises by operation of law based upon presumed intention of the parties, and is a resulting trust.

4. Where a party knows that he is dealing with trust funds he is held to knowledge of the character of the trust whether he advises himself of its precise nature or not. A knowledge of the fact that another person has equitable title to the fund is sufficient to charge him with knowledge of the character of the trust.

5. Admission by parties sought to be charged as trustees that they were trustees sworn to by disinterested witnesses, such admissions being accompanied by corroborating circumstances, are evidence of the highest character. This in a suit to establish the trust against one who claims through the party so admitting the trust. So also is the fact that all the parties dealing with the estate admitted the existence of the trust for years admissible as evidence, as well as the fact that at the time of the purchase the financial condition of the party was such as "makes it impossible for him to have been the purchaser."

6. Where the facts set forth in the bill disclose the nature of an express trust under a will that the character of the trust is misconceived and the effect of the devise or bequest not correctly stated is immaterial. The court will make its own conclusion from the facts stated and proved.

7. Where the facts are set forth in the original bill an amendment simply stating a conclusion of law deemed to follow from those facts, such as a general charge that an act was the result of fraud, accident or mistake, no specific act of fraud, accident or mistake being alleged, may and should be treated as surplusage. While this is bad pleading, its effect cannot be to destroy equities otherwise alleged and shown upon the hearing to exist.

Appeal from the Circuit Court for Leon county the case having been transferred from Madison county.

The facts of the case are stated in the opinion.

*S. Pasco* and *C. W. Stevens* for Appellants.

*A. Paterson*, *F. W. Pope* and *J. B. Marshall* for Appellees.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

The subject matter of this controversy is a tract of land in Madison county, Florida. All of the parties, plaintiffs and defendants, except J. Leroy Gale and her husband, Frank P. Gale, and Sarah E. Ward and her husband, John E. Ward, maintain that the property is the subject of a trust under, and is controlled by the will of Andrew Hampton, who died in the State of Georgia, in the year 1840, and that under this will and a deed from Rachel Griffin, the daughter of Andrew Hampton, who had, as they allege, a life estate under the will, the present existing equitable interest in the land is divisible into six parts, one of which goes to each of the children of Hardy Griffin and Rachel Griffin. That is to say, one part each to Ella L. Harby and William D. Griffin, children of Hardy and Rachel Griffin, one part to J. Leroy Gale, who is the sole heir of J. L. Griffin, a son of Hardy and Rachel, one part to Joseph L. Lelia and Eugene Griffin, heirs at law of A. A. Griffin, a son of Hardy and Rachel, one part to Lucia Jones and Hattie Vandiver, children of Mary E. Whitlock, a daughter of Hardy and Rachel Griffin, one part to S. Janie Hines, a child of S. Janie McGehee, who was a daughter of Hardy and Rachel Griffin. Plaintiffs seek a partition of the land according to this view, and such is the prayer of the bill. The defendant, Leroy P. Gale, on the other hand insists that the land was the property of A. A. Griffin and Joseph L. Griffin, children of Hardy and Rachel Griffin, that they held it as tenants in common, and that she as the sole heir of Joseph L. Griffin is entitled to one-half

of the land. The general claim of plaintiffs is that certain trust property, in which they had a sixth interest as above set forth, under the will of their grandfather, Andrew Hampton and the deed of their mother Rachel, was invested in this land, and that the land was paid for by the proceeds of the trust property and its use. The land was conveyed by Thomas J. Linton to A. A. and Joseph L. Griffin, and the deed is absolute upon its face, A. A. and Joseph L. Griffin giving a mortgage to pay the balance of the purchase money. The defendant insists that no part of the trust fund entered into the purchase and that it was made upon the credit of her father and her uncle, A. A. Griffin, who afterwards satisfied the mortgage by the results of a joint use and cultivation of the land. The plaintiffs insist that a large cash payment consisting of the trust fund, was made by A. A. and J. L. Griffin, and that the payment of the mortgage was made from funds realized from the after cultivation of the land by slaves belonging to the trust fund, and that both Joseph L. and A. A. Griffin, the grantees, and the grantor Linton, acknowledged at the time of the execution of the deed by Linton that A. A. and Joseph L. Griffin acted as trustees in the purchase, and that neither they nor their representatives up to the time of the institution of this suit ever denied that they were trustees.

The Circuit Court sustained the view of the plaintiffs, and made a decree accordingly, from which only two of the defendants, J. Leroy Gale and her husband, appealed, which appeal is entered after a severance as to the interests of F. P. Gale and wife.

The first ground of appeal is that the merits of the cause are with the appellants.

The will of Andrew Hampton and the relationship of the parties to him is not denied. The interest which went

to Rachel Griffin, his daughter, or to her children must be
fixed by it.   As to this matter the testator directed, "that
all my estate, both real and personal, be divided into nine
equal lots or shares, and my executors shall set apart by
lottery one of said lots or shares to each family of my
grandchildren."   The testator directed that the fathers of
his grandchildren should have the "emoluments and profits"
of the property, given to their children during their lives
(the fathers) and that "should any of my grandchildren
marry or become of lawful age then and in that case their
father or fathers may give to them a portion or share of
their property if they think proper to do so, otherwise it
will remain together until their father's death, then to be
equally divided between such grandchildren, share and share
alike."   The testator, as to the property given to the chil-
dren of Rachel Griffin, which is the origin of the trust
here, directed " that the following exceptions bear in rela-
tion to every part of my estate, that is to say, the portion
or part of my estate that I bequeath to the children of my
beloved daughters Rachel and Mary, to be held in trust by
my executors, and the said executors to use and control in
any manner that they think most conducive to the interest
of the children of the said Rachel and Mary, free from the
control of their present husbands, or any future husband
they may have, until it would have been distributed had
this exception not have been made."   The executors named
in the will were the four sons of Andrew Hampton, of
whom Benjamin W., John M. and Andrew Y., qualified
and undertook the trust.   The original trust thus arising
under a will is an express or direct trust, and it is con-
trolled, and to be interpreted by the terms of the will.
It is apparent that under this will Mrs. Rachel Griffin had
no interest in the property devised or bequeathed to her six
children.   The legal title was in the executors qualifying

and the equitable estate was in the children, each child to be entitled to his or her share upon his or her marrying or becoming twenty-one. All of the children of Rachel Griffin are twenty-one years of age, and all of them now living, unless it be William D. Griffin, have been or are married.

The deed of Linton to A. A. and J. L. Griffin being absolute on its face, the next question here involved is whether it can by shown by parol testimony that they purchased as trustees with a knowledge of the trust; that the cash purchase money was money realized from sales of property coming to the children under the will, and that the subsequent payments upon the land were made from moneys realized though the cultivation of the land by slaves belonging to the trust property and derived under the will. Perry on Trusts, in treating of this subject, asks the question, " whether trust money can be followed into land by parol evidence," and he answers the question by stating that " it is clearly established it may on the ground that a purchase with trust money is virtually a purchase paid for by the *cestui que trust,* and such a purchase is a trust by operation of law and not within the statute of frauds, and the fund may be followed so long as its general character can be identified." Perry on Trusts, §§138, 127.

Sir William Grant, in Lench vs. Lench, 10 Ves., 517, speaking of this matter, says: " Then as to the other ground that the purchase was made with the trust money, all depends upon the proof the fact; for whatever doubts may have been formerly entertained upon this subject, it is now settled that money may in this manner be followed into the land in which it is invested; and a claim of this sort may be supported by parol evidence."

Says Lewis, Justice, in Thompson's Appeal, 22d Penn. State, 17 : " Whenever a trust fund has been wrongfully

converted into another species of property, if its identity can be traced, it will be held in its new form liable to the rights of the *cestui que trust.*  No change of its state and form can divest it of such trust.  So long as it can be identified, either as the *original* property of the *cestui que trust* or as the *product* of it, equity will follow it, and the right of reclamation attaches to it until detached by the superior equity of a *bona fide* purchaser for a valuable consideration without notice.  The substitute for the original thing follows the nature of the thing itself so long as it can be ascertained to be such."  See also Story's Eq., §1257, cases cited to note 6 ; §128, Perry on Trusts.

This is a resulting trust, so far as it is created by operation of law, and based upon presumed intention of the parties, and acts of A. A. and J. L. Griffin intended to be acts as trustees unaccompanied by fraud.  If the purchase money belonged to the trust fund, and A. A. and J. L. Griffin knew that fact, and by virtue of their influence with their mother, Rachel Griffin, as her sons, and contrary to the understanding with her they took the deed in their own name, intending a personal gain, it is a trust as against the children, accompanied by fraud, and that is a constructive trust.  From such circumstances and relations courts of equity raise a trust by construction.  "This trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title and order him to hold it or execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society."

It makes no difference in this case that they did not understand that the trust was for the children, and there was no life estate in the mother.  If they knew it was trust money they were dealing with they are held to notice of its character whether they took the trouble to advise them-

selves of its precise nature or not. It is enough for them to know that some other person has an equitable title to the property, and that they are dealing with trust property. A knowledge of such facts as should lead them by inquiry to full knowledge of the actual facts is all that is necessary.

This leads us to an examination of the evidence. The deeds in evidence show the following transactions: That on the 10th of October, 1854, Thomas J. Linton agreed to sell Hardy Griffin a large body of land in Madison county, including nearly all of the land mentioned in the bill, for the sum of $25,000, $2,800 on the first of January of the years 1856, 1857, 1858, 1859 and 1860, $3,000 on the first of January, 1861, and $8,000 on the first of January, 1862, the note to draw interest at six per cent. per annum from January 1, 1855, and that Griffin was to have possession on January 1, 1855, and was to give a mortgage on the land to secure the payment of the seven notes; that on February 8, 1855, Linton conveyed this land to Hardy Griffin, and that Hardy Griffin gave a mortgage to him on the land to secure the payment of the notes which were given as agreed upon, Mrs. Griffin releasing her dower interest therein; that on the 14th of March, 1856, Hardy Griffin reconveyed the land to Linton, stating the consideration to be a payment of $25,000, Mrs. Rachel Griffin, the witness, releasing her dower interest therein; that on the next day, the 15th of March, 1856, Linton conveyed 1,480 acres of land included in the former transactions, and 120 acres adjacent thereto, making in all 1,600 acres to J. L. and Archibald A. Griffin as tenants in common, the consideration being stated to be a payment of $12,000; that on the same day (March 15, 1856) Archibald A. and Joseph L. Griffin mortgage the same land to T. J. Linton, reciting an indebtedness to him shown by six promissory notes, the

first due January 1, 1857, for $2,507, the others for different sums becoming due January 1, 1858, '59, '60, '61 and '62 for the sums which, with the amount of the first note, aggregate the sum of $17,914.70, the notes given for the several sums not bearing interest until after their maturity, the wife of J. L. Griffin, Sarah E., relinquishing her dower interest, and that this mortgage was satisfied on or before the 28th day of May, 1863, and the evidence discloses that J. L. Griffin died before the first note became due in December, 1856, and there is no evidence in this record which shows that his administrator, or any one representing him, ever paid a cent of money for him upon the mortgage debt. He is the father of J. Leroy Gale, and she is the defendant now claiming one-half of the land. In addition to this, if the evidence in this case shows any one fact with distinctness and certainty, it is the fact that J. L. Griffin, the ancestor of J. Leroy Gale, at this time did not own but a very small property. J. L. Griffin died the second year after he came to Florida. He had when he came one buggy, one trunk and two horses, and A. A. Griffin had no property but two horses, and this property, both of J. L. and A. A. Griffin, their mother testifies her husband bought for them with her money. For the year 1855 his taxes are assessed at $4.07, and his property named as a carriage and three slaves, and in 1857, after his death, his administrator pays taxes on slaves valued at $1,200 and notes valued at $400. This, however, is not all of the evidence upon the subject of the financial ability of these parties. As to this matter and all the other facts a substantial statement of the essential portions of the evidence will disclose the truth.

This leads us to the consideration of the testimony.

Mrs. Rachel Griffin testifies that her father, Andrew Hampton, gave her and her children a place in Lawrence county, Georgia; that she sold that place and with the

proceeds bought a place in what was then Baker county
and now Dougherty county, Georgia; that she sold this
place, moved to Florida and bought the plantation
described in the bill, making the first payment
from the proceeds of the sale of the land in
Georgia; that the sale in Georgia was for part cash
and part credit, and the balance was applied to the pay-
ment for the Florida place; that Wade Hampton was her
first trustee, and after his death John M. and Andrew Y.
Hampton became her trustees, her husband, Hardy Griffin,
acting in all these transactions with the permission of her
trustees; that the titles were made to A. A. and J. L.
Griffin, because she chose them as her trustees, and that
they consented thus to act.   She says that " when we came
to Florida we bought the plantation where M. W. Linton
now lives" from Mr. T. J. Linton; that he, Mr. T. J. L.,
became dissatisfied as her property was trust property;
that the first deed was made to her husband, Hardy Grif-
fin; that her husband then sold the place back to Mr. Lin-
ton, and bought then the place described in the bill; that
the deed to this place was made to her sons A. A. and J.
L. Griffin, who agreed to act as her trustees, Mr. Linton
agreeing to take a mortgage from them for the balance of
the purchase money; that he would not make the transac-
tion with her husband, because he was embarrassed; that
her sons then gave a mortgage on the place to Mr. Linton
for the balance of the purchase money, and did it by her
direction; that the mortgage was paid by A. A. Griffin,
her trustee, J. L. Griffin, having died the second year after
she moved to Florida, and had nothing to do with the
payment; that A. A. Griffin paid the mortgage with the
proceeds from the negroes her father gave her, working on
the place.   She produced three of the mortgage notes,
which she says she has had in her possession ever since

they were paid ; that all of the notes were paid and in her possession. One of these notes is endorsed, " paid April 1st, 1861, by trust funds, A. A. Griffin, Trustee "; that J. L. Griffin had no property when he came to Florida, but one buggy, a trunk and two horses ; that A. A. Griffin had two horses, which her husband bought for them with money from her estate, and that neither of her sons ever claimed any part of the land ; that all the property was given in by A. A. Griffin, her trustee ; that if her husband ever paid any taxes upon it he paid them as agent. She produces a number of tax receipts ; among them we find a receipt for the year 1852, to Hardy Griffin, as agent for his wife and children, for $59.52, and a receipt to J. L. Griffin for forty cents for his taxes for the year 1852. A. A. Griffin pays a like forty cents for his taxes. For the year 1855 J. L. Griffin $5.70, and A. A. Griffin $1.84, while A. A. Griffin, as agent, pays $70.27 railroad tax for the year 1855. There are other receipts, some by A. A. Griffin, as trustee, and there are copies of assessments taken from the office of the Comptroller of Public Accounts of the State, which show that A. A. and J. L. Griffin and their father had very little property, while Mrs. Griffin owned or proposed to own the estate in question here. She says that her husband, when they were married, had a good deal of property ; that he lost it by standing security for his brother, who bought a steamboat, which was burned on her first trip ; that he had to pay $30,000 debt and interest from year to year ; that her husband was sued, and all or a part of his property sold ; that a debt still remained unpaid ; that they then moved to Alabama, and the debt followed him there and broke him up again ; that her father then wrote to her that if she would come back to Georgia he would buy a plantation for her and her children ; that they then went back to Georgia, to the plantation he gave her, called the

" Colwell " place ; that her father lived about three weeks after they moved back to Georgia ; that she got the portion of property as devised to her by the will, and it included the " Colwell " place, which is the place referred to in her testimony, as having been sold when she moved to Baker county, Georgia, and from the proceeds of which she derived her property in Madison county, Florida ; that the business of the plantation had always been carried on by her direction, and that neither her husband nor her trustees ever transacted any business, as to the land, without her consent or direction.  A number of account sales of cotton are produced as evidence by complainant's counsel. They show sales on account of Mrs. Rachel Griffin, and of A. A. Griffin, trustee, in 1867, 1869 and 1870.  She says further, that she has given over her interests to her six children, and has made quit claim deeds for their parts to such of them as desired it, and they fixed it up among themselves.

These deeds are from Rachel Griffin to Ella L. Harby, S. Janie Hines, W. D. Griffin, trustee of minor children of A. A. Griffin, and W. D. Griffin in his own right, and extend in date from April 8, 1875, to January 22, 1877.

A deed from Sarah E. Ward, late widow of J. L. Griffin, and mother of defendant, J. Leroy Gale, who asserts the claim to one half of the land to Mrs. Rachel Griffin, is produced.  It is dated the 26th of September, A. D. 1874. It recites as a consideration the fact that her former husband had never paid for the lands described in it, and " that the titles to said lands were made in the name of A. A. and J. L. Griffin, with the distinct and full understanding that they only held these titles to this land as the trustees for Mrs. Rachel Griffin, of the county of Madison, State of Florida."  This recital is made substantially a second time in the deed.  The deed purported to convey all of the

dower interest of the grantor in the lands, and the lands were a part of those embraced in the deed to A. A. and J. L. Griffin. The deed, Mrs. Griffin says, was brought to her by her son, A. A. Griffin, not long before he died. A letter of the widow of J. L. Griffin to A. A. Griffin is also placed in evidence. This letter shows a good deal of unfriendly feeling towards " Ella and Sis Mary," meaning thereby two of the daughters of Hardy and Rachel Griffin, and recites a cause, which if it existed, would naturally occasion such feeling. It adds nothing to the recitals in the deed, and no further reference to it is necessary. There is also in evidence a receipt given by Sarah E., as guardian of her daughter, J. Leroy Griffin, to A. A. Griffin, administrator of the estate of J. L. Griffin, for three slaves. The receipt recites that it is all the property of the estate of J. L. Griffin left after discharging the debts of the estate. This witness states further, that J. L. Griffin died insolvent; that A. A. Griffin administered on his estate; that his debts were paid from her estate; that his father-in-law, from whom he had received two negroes and two children, came from Georgia and got them. She says that J. L. Griffin lived with her up to his death. Upon cross-examination this witness states that she got a thousand or fifteen hundred dollars for the place she sold in Lawrence county, and eight or ten thousand dollars for the place in Baker county; that she does not recollect the exact date she came down to Florida, but it was about twenty-two years ago; that the last payment on the place in Georgia was made before the war; that her trustees served generally, and when they did not her husband did; that the mortgage of A. A. Griffin and J. L. Griffin, was paid up during the war; that J. L. Griffin's wife, when married, received no property; that the estate of A. A. Griffin never was administered upon; that he had no estate but his cattle; that

she gave $4,000 or $5,000 for the land in Baker county. This witness upon subsequent examination says she requested her sons to take a deed to this land as trustees; that she thought they had done so until just before the commencement of this suit; that it was at Mr. Linton's request she appointed them trustees; that they all led her to believe that it was a trust deed and her sons so acted; that soon after said deed was given she sent J. L. Griffin, as her trustee, to Georgia to settle some business with her brother-in-law, Mr. Spicer, and others.

Mrs. E. A. Spicer, witness for complainants, testifies as follows: I know all the parties to this suit. I knew Hardy Griffin. I think Hardy Griffin and Rachel Griffin came to Florida in 1854, but do not know exactly. I knew A. A. and J. Leroy Griffin ever since they were born; they were the children of Hardy and Rachel Griffin. When Hardy and Rachel Griffin came to Florida they had only trust property belonging to Rachel Griffin. They bought large bodies of land when when they came to Florida from Thomas J. Linton. They could not pay for the land in full, but what they did pay was paid out of these trust funds brought from Georgia. The deeds were first to be made to Captain Hardy Griffin, but Thomas J. Linton found out that Captain Griffin owned nothing but trust property belonging to Rachel Griffin, and was in debt. Mr. Linton then told A. A. and J. Leroy Griffin if they would give him a mortgage for the balance due on the land he would make them a deed individually, but not as trustees. Although A. A. and J. Leroy Griffin wanted it made that way, I mean to them as trustees, because Thomas J. Linton said to me trustees were not allowed to mortgage property under the laws of Florida. T. J. Linton told them they could, after, arrange the matter with the other children, he only wanted to be secured, and desired the mortgage from A. A. and J. Leroy

Griffin individually for the reason above assigned, although he knew it to be trust property from inquiries made from Georgia and other sources. I purchased a portion of these lands known as the Easter Fields, now controlled by J. Leroy Gale, from A. A. Griffin, as trustee for Rachel Griffin, he saying that Rachel Griffin was willing to fix up the deed. I went to see Thomas J. Linton in reference to some other matter, and he then told me not to purchase the lands from A. A. Griffin, as he did not think he could make good title to it, as the property belonged to Rachel Griffin, and was trust property. I then told him that Rachel Griffin would sign the deed. Mr. Linton told me he would give me a four thousand dollar note, which he held against the Griffins on the land and had a mortgage to secure the same, and that he would release said mortgage and give me a good title, as A. A. Griffin could not, taking the said land in payment for said note, and then sell the same land to me, taking a mortgage from me to secure the payment thereof, giving me the same time he gave the Griffins. I concluded I would not take the place, even after putting some improvements upon it. *I have heard both A. A. and J. Leroy Griffin say, repeatedly, that they held these lands as trust property for their mother*, Rachel Griffin. They only claimed each a horse and buggy as their individual property. J. Leroy Griffin came to me in Georgia in 1856, after the purchase of these lands, for the purpose of winding up some trust affairs, and said to me: Aunty, I have come to settle up some trust business of ma's, as you know I am her (Rachel Griffin's) trustee. I came to see uncle Jack (that is my husband) to settle some trust business, but he is dead. He told me not to be uneasy, as he would settle these matters with me, as he was trustee. The trust estate was owing me at the time. I have often heard A. A. Griffin say this property was his mother's, and regretted J. Leroy

Griffin, his brother, died before they could have this matter properly arranged, and he, A. A. Griffin, went to Georgia to see the widow of J. Leroy Griffin, and said he thought he had it all settled up. I know it was by the request of Rachel that A. A. and J. Leroy Griffin agreed and did act as her trustees.

On her cross-examination, she says: I am sister to Mrs. Rachel Griffin. I have been living in Florida since 1861. I moved from Albany, Dougherty county, Ga. Mrs. Rachel Griffin and I were near neighbors in Georgia, Dougherty county; our plantations joined. The plantation up there I know was my sister Rachel's, because my husband, as trustee, purchased the place for her. The place up there was sold to Dr. Hunt and the proceeds applied to the purchase of this place. I mean these Linton lands mentioned in this suit. The lands I referred to in my direct examination are located near Greenville, in Madison county, Fla., and are the lands mentioned in this suit for partition. In reference to that part of my direct examination, where I said J. Leroy Griffin, who was my nephew, visited me in 1856, I do not know what the main object of his visit in that county was for, but I think he had been attending court at Newton, and came by to see my husband, to whom, I think, he was indebted as trustee for a certain amount due from Mrs. Rachel Griffin. *I lived with A. A. Griffin for twelve months, during which time I frequently heard him say he was trustee for the property mentioned in this suit.* He never claimed a foot of it, but always spoke of it as his ma's. I have no interest in this suit whatever. In my direct examination, where I spoke of purchasing the Easter Fields, I mean that I simply agreed to do so. No deeds or writings were ever drawn up. I moved on them intending to take the place, but concluded not to do so, under the advice of Mr. Linton. In my direct examination,

where I said Mr. Linton said he would make me a good title, I meant he, would lend me the money, that is, the four thousand dollar note to pay for the land, and that the Griffins, upon its receipt from me, would make me a title to the said Easter Fields, the said Linton cancelling the mortgage he held upon the Easter Fields; then I was to make a mortgage on said lands to secure to the said Linton payment of the said four thousand dollar note. *I have been living here in Greenville, in Madison county, since 1861, most of the time with the Griffin family.* Rachel Griffin, my sister, has been living on this place in dispute all the time, claiming it as her own, and I never heard any one, before the commencement of this suit, deny or attempt to deny her title to the same. A. A. Griffin lived on a part of the plantation, that part that I thought once of purchasing, and exercised supervision over the whole as trustee, always receiving instructions and directions from Mrs. Rachel Griffin. I was intimately acquainted with A. A. and J. Leroy Griffin. *I knew their means and opportunities for making money, and don't think it possible for them to have made money sufficient out of their own means to have paid for these lands, indeed I can say positively that they had not money of their own to purchase said lands,* but that they were purchased with trust money belonging to Rachel Griffin.

Upon a subsequent examination this witness states that Mrs. Rachel Griffin's plantation in Georgia and hers joined; that she knew it was her sister Rachel's, because her husband, who was trustee for Mrs. Griffin, bought it. She says she lived with A. A. Griffin for twelve months, and frequently heard him say he was trustee for the property; that her sister, Rachel Griffin, has been living on the place all the time, claiming it as her own; that she never heard any one, before the commencement of this suit, attempt to deny her title to the same, and that she has personal knowl-

edge of the fact that neither A. A. nor J. L. Griffin had means or such opportunities for making money as this purchase required ; that she did not witness any of the payments for the land ; that J. L. Griffin in 1856 spoke to her about this purchase; told me he was trustee; spoke of these lands as his mother's; that this was in Georgia. The rest of this testimony is already in substance stated.

W. O. Hampton says he knows the parties, and that Mrs. Rachel is " the sister of my father," B. Wade Hampton, who was trustee for the property of Mrs. Rachel Griffin, received from her father's estate. At "my father's" death, his administrator acted as her trustee, then A. Y. Hampton, her brother, was her next trustee. This was all in the State of Georgia. The next trustees who were appointed, or acted as trustees, were A. A. and J. L. Griffin. Does not know that they were appointed by order of court. The first trustees were appointed by the will. He lived with Mrs. Rachel Griffin and family in Dougherty county, Georgia, before they moved to Florida. I remember their selling the place they lived on there, which place belonged as trust to Rachel Griffin. I remember their buying the premises of Thomas J. Linton, the deed being made to Hardy Griffin ; that Linton was dissatisfied when he learned that Hardy Griffin was insolvent. He demanded a settlement, and they met and agreed to settle by turning over a part of the lands to Linton, and purchasing the lands that are now in dispute; that A. A. and J. L. Griffin have both told him that they were the trustees of this property in the place of A. Y. Hampton. They were here a year or more before I came to Florida. I lived in a mile of the place of Rachel Griffin, the first year I came here, and have visited the house frequently for the last twenty years, and have had dealings with Hardy, A. A. and J. L. Griffin ; that in a transaction with Mr. Lin-

ton he took in part payment $3,000 of the notes given for the land ; that he did not wish to take the note, but that Mr. Linton said that A. A. and J. L. Griffin were trustees for the whole property, the notes were good. These notes were paid, $1,100 out of the estate, and the balance from proceeds of cotton of Mrs. R. Griffin ; *that Mrs. Griffin has held* this property in her possession ever since it was purchased, until the division was made among her children. He says that he was intimately acquainted with A. A. and J. L. Griffin, and they had but very little property when they came to Florida ; that at the time of the sale of the land, J. L. Griffin had, through his wife, a few negroes, a man and a woman ; that A. A. Griffin had a few cows, also two horses ; that at the time of the purchase from Linton, she had some thirty-seven or eight negroes in all, and that she received these from her father's estate. Upon cross-examination, he says that A. A. and J. L. Griffin told him in September, 1855, at their father's house, that they were now the trustees of their mother's property and had got rid of a great trouble ; that she was in the room when. J. L. Griffin died. Upon a subsequent examination this witness says : " The payment made by Hardy Griffin, when he first bought the land from Linton, was used as a payment on the purchase of the same place, when the deed was made to A. A. and J. L. Griffin ; that he does not recol- lect the amount; that the balance was in notes secured by a mortgage. He states that Hardy Griffin had failed to pay the second payment on the land, and Linton became dissatisfied, understanding that Griffin was a bankrupt; that Linton proposed to take the land back ; that Linton and Griffin agreed to have an arbitration, and the arbitra- tion met at Sidney Linton's, in Jefferson county ; that the arbitrators were A. A. Griffin, J. L. Griffin, Dr. Turnbull, Sidney Linton and himself; that T. J. Linton and Hardy

Griffin were present; that the award was that Linton should turn over a large part of the lands that Hardy Griffin had bought from him, Linton agreeing to put the payment that Hardy Griffin had made upon the first purchase to the credit of the second purchase, which are the lands now in controversy, and that the papers were drawn up accordingly and the deed made to A. A. and J. L. Griffin; that the first payment was made from the proceeds of the sale of trust lands in Georgia. This witness says: "When Linton made the trade with Hardy Griffin, he did not make it with him as trustee, but as Hardy Griffin. He knew nothing about this trust estate at the time," and the deed was made to A. A. and J. L. Griffin "because Mr. Linton required it to make his money safe, they being then the legal trustees of their mother's property." He says: "I rode with A. A. Griffin the evening of the arbitration, and he told me he and his brother J. Leroy were the legal trustees, and the reason why the deed was signed to them, not as trustees, was because Linton objected to take a mortgage from them as trustees. I then asked him, do you consider this land trust property? His answer was, I do. I asked him and J. L. Griffin if they considered the lands trust property, and their reply was, we do." He says they did not want Mr. Linton to make them a deed as trustees, because Mr. Linton proposed his own terms, and they accepted them; that is what he based his terms upon; that he would not make a trust deed because he would not take a mortgage from trustees; that is what he proposed in the arbitration and they accepted it; that he heard Mr. Linton, on the day of arbitration, say to A. A. and J. Leroy Griffin, that they need not tell their mother; that they could soon pay it and make it all right. As to the payment of the purchase money, he says Hardy Griffin paid on the balance of the purchase money, as long as he

lived, from the proceeds of the plantation which was worked by the slaves of Rachel Griffin. After his death A. A. Griffin settled the balance of the claim with cotton that his mother had on hand after the war. Upon cross-examination, he says that he did not see Hardy Griffin make the first payment to Linton; that he did not see any money paid over from trust property in Georgia to Hardy Griffin, but saw the trustee, A. Y. Hampton, and Hardy Griffin when they made the agreement that Hardy Griffin should sell the land there and buy lands here; that he was told by Judge A. Y. Hampton, the former trustee, that the trusteeship was transferred to A. A. Griffin and J. Leroy Griffin; that they had been appointed in his stead here. They, themselves, told me so. I have never seen any order appointing them as trustees.

Mrs. Laura A. Horn, a sister of Mrs. Rachel Griffin, testifies that she did not move to Florida until two years after her sister; that she was here on a visit when J. L. Griffin died; that she has known the parties to this suit all her life. She swears positively that when Hardy and Rachel Griffin moved to Florida there was no property in the hands of any of the family except trust property. She is equally related to all the children, and has no interest in the suit; that she never heard either J. L. or A. A. Griffin lay any claim to the property, but has heard A. A. Griffin say that he was trustee for this property, and in all business transactions he always consulted his mother. Upon cross-examination, this witness says she came to Florida about nineteen years ago, but that she don't remember dates exactly, and that the land was purchased by the proceeds of the trust fund, because they had no other property that she knew of.

Upon a subsequent cross-examination, the statements made upon the direct examination were substantially re-

peated, except that she says that she knows that until the death of Andrew Hampton, Hardy and Rachel Griffin were very much reduced in circumstances; that she knew nothing of her own knowledge as to the purchase of the Linton lands; that she heard A. A. Griffin and Hardy Griffin both say that A. A. Griffin was trustee, and that A. A. Griffin always spoke of the land having been paid for in trust property.

Dr. Jacob Cohen testifies that he has known A. A. and Rachel Griffin thirty years; knew them in Baker, now a part of Dougherty county, Georgia; that he lived in Lawrence county; was a practicing physician there, and boarded with Mrs. John M. Hampton, and that he has lived in Madison county since the spring of 1862; that he was intimate with A. A. Griffin, and sought to buy land from him, and that Griffin informed him that he owned no land, but held some as trust property for his mother, and would lease me some land, as trustee; that he leased the land for five years; that at the expiration of the lease the land and improvements should return to Mrs. Rachel Griffin; that the lease was signed A. A. Griffin, trustee. It has been lost or destroyed; that the land he leased was a part of the land in dispute here. Upon cross-examination, the witness says that he married Mr. Harby's mother; that he does not know of his own knowledge whether A. A. Griffin owed any debts or not.

George W. Hampton testifies that Mrs. Rachel Griffin is his aunt; has known her since he can remember; that he lived in the family before they moved here, and has lived with them here; that he visited to Florida in 1855, and moved in 1856; that he brought J. L. Griffin to Florida in his buggy in the spring of 1855, after the crop was planted and growing; that he does not remember any talk then between them as to the land; that he thinks all the prop-

erty J. L. Griffin had was a pair of horses and a buggy; that Leroy Griffin agreed to take the Easter place, and employed him to build a house on it; that he did not furnish it; that J. L. Griffin never moved there; that he died on Christmas day, 1856, at his mother's place; that A. A. Griffin paid him for the work; don't know where he got the money from; that he took J. L. Griffin's word for it, for I knew he could get it any time from his mother; that he (J. L. Griffin) told him (Hampton) that he (J. L. Griffin) did not have any money, but that he would get it and pay him; that he has never heard J. L. Griffin say anything about the property; has heard A. A. Griffin say that everything belonged to his mother. Upon cross-examination this witness says that his uncle, Hardy Griffin, furnished the house; that he hired Whitus, and Jesse W. Walker was an apprentice under him at the time; that he does not know whether the house was completed when J. L. Griffin died; that he put $36 worth of work on the house, and his uncle, Hardy Griffin, managing for his wife, finished the work; that A. A. Griffin was trustee, but his uncle did the managing; that he does not know whether J. L. Griffin had any cash, notes or mortgages when he came to Florida, but don't think he did.

John W. O'Neal testifies that J. L. Griffin, who was his guardian, stated to him that he himself had nothing except his horse and buggy, but that he would give a good bond. This conversation was had when his appointment as my guardian was suggested; that he boarded with Mrs. Rachel Griffin, and J. L. Griffin likewise lived with her also. Witness was about fifteen years of age when J. L. Griffin died.

E. E. Barclay testifies that he knows the parties; has been in Madison county twenty-four years next February; that Hardy Griffin came in the November before; that he

conversed with Mr. Linton about the trade; that Mr. Linton stated that he understood that Hardy Griffin was insolvent; that he had made a trade with him; that he was fearful as to the payment; feared that the mortgage was worth nothing, as he understood that the property was trust property; that afterwards Linton told him that he had succeeded in "recanting" that trade, but he had let Mr. Griffin have a portion of the lands; that he had made the deed to A. A. and J. L. Griffin, as trustees for Mrs. Griffin, and taken their mortgage. He states that Hardy Griffin told him that the property belonged to his wife and children, not subject to his debts. This, when he threatened to sue him for a debt which occurred in 1857 or 1858; that A. A. Griffin told him that what his father said was true; that his mother would pay him the money, and if she did not he would for her; that he had at different times business transactions with A. A. Griffin; always told him that he was managing the trust; that he has no interest in the world in this suit. The cross-examination of this witness elicited nothing, and in a subsequent cross-examination he stated that his conversation with A. A. Griffin was in the fall of 1857.

W. D. Griffin, who is the brother of A. A. Griffin and J. L. Griffin, testifies that A. A. Griffin considered the property his mother's, and did the business as trustee; has heard that A. A. Griffin owed debts at his death; that he did not consider that A. A. Griffin owned the land described in the deed to him, of the 22d September, 1874. The rest of his testimony concerns, principally, the matter of the division and the character of the land. He says he is the trustee for the children of A. A. Griffin, his brother.

Z. T. Hines, the husband of S. Janie Hines, who received one share in the division, swears that he is satisfied with what they got.

Mrs. N. A. Hampton, who is the sister of Sarah E. Cox, who married J. L. Griffin, and the aunt of J. Leroy Gale, the defendant in this case, who insists upon an interest equal to one-half of this property. She says that she has known Mrs. Rachel Griffin, A. A. Griffin and J. L. Griffin, since 1852; that Mrs. Rachel Griffin owned property left her by her father as trust property; that Judge A. Y. Hampton was trustee; heard him say before she was married that he afterwards transferred the trusteeship to A. A. and J. L. Griffin; that she was not present at said transfer, but knows about the time it was done; that Judge A. Y. Hampton was insolvent and was growing old; he did not like to attend to the business; and also because the Griffin family was coming to Florida; that she has heard J. L. Griffin say he was managing the Linton lands, as trustee for his mother: that Judge A. Y. Hampton has told her repeatedly that A. A. and J. L. Griffin were trustees for their mother: that J. L. Griffin told her father in her presence in September, 1856, that he was acting as trustee for the lands in Florida, bought with the money for which the lands in Georgia were sold: that she is confident J. L. Griffin had no other property but the trust property, except the property he got by marriage, which consisted of a negro man, woman and three children; that her father said he would give each of us $3,000 worth of property in negroes, which was the amount I got, and I am confident J. L. Griffin got no more; that J. L. Griffin had no property when he came to Florida, except the negroes above mentioned and a buggy and two horses, and when J. L. Griffin died his father-in-law, Mr. Cox, came to Florida and carried back to Georgia these negroes, and everything he had given his daughter, the wife of J. L. Griffin; that the land she refers to is the land in dispute here; that she has no interest in the suit, and that J. L. Griffin and her sister mar-

ried, she thinks, in February, 1858. Cross-examned, she says that the money that the Lawrence county land sold for bought the Dougherty county land, and the money the Dougherty county land sold for bought these Florida lands ; that she saw no money change hand in these transfers ; that she heard Judge A. Y. Hampton, her husband's father, who was the former trustee, say these things ; never saw any of the business transactions in reference to the transfer of these lands ; that she does not remember seeing any of the deeds transferring any of this property ; that she had in her possession a paper which she destroyed, making J. L. Griffin and A. A. Griffin trustees ; that she does not know whether it was a copy or the original, and does not remember by whom it was signed ; that she did not read the whole of the paper ; that it was found among the papers of A. Y. Hampton ; and that she does not remember any of the names that were upon the paper, except the names of J. L. and A. A. Griffin ; that the paper read as transferring the property of Mrs. Rachel Griffin to them, as trustees, from Judge A. Y. Hampton, the former trustee.

The foregoing embraces substantially the testimony for plaintiffs.

For the defendants :

Joseph Bishop testifies that he knows the lands sold by Linton to the Griffins, he thinks some twenty years ago ; that he did all the hewing on a double-framed house in Mr. Lee Griffin's name, on the Easter place ; that J. L. Griffin said it was his place ; that he, J. L. Griffin, sent him word by his father to get him 12,000 shingles ; that when the shingles were ready he sent a note to J. L. Griffin for the money ; that Hardy Griffin came with a wagon and paid him $20 for J. L. Griffin, who was sick at the time ; that a short time afterwards he went to get the balance of the money and met Hardy Griffin and Arch Griffin, and Hardy

Griffin told him that as soon as they could haul some cotton to the Monticello factory they would pay him the balance of the money; that Lee Griffin died pretty soon; that shortly after this he saw Arch Griffin, who told him that he would have to wait until an administrator was appointed, and that Mr. Hardy Griffin, as Lee Griffin's administrator, told him that Lee Griffin's estate was worth nothing; that he did not get the balance due him; that he never heard Lee Griffin say that the property was his and Arch's, but that Lee Griffin said that the place he was working on was his. I have heard Arch. Griffin, since the war, say that everything on the place was his; that during his (A. A.. Griffin's) last illness he tried to sell me two forties of the land; that he wanted to sell it on account of the taxes. Upon cross-examination, he says that he has heard that the property was Mrs. Rachel Griffin's, and has heard differently; has heard Arch. Griffin say before executions issued against him that the property was his, and after executions issued he said it was his mother's.

Charles F. Bemis for defendants. This witness says he moved to Florida in 1862, and commenced merchandizing in 1865; that he knew Hardy Griffin, but did not know J. L. Griffin; that he sold goods to A. A. Griffin in 1865 and 1866, individually, to the amount of $1,000, which he settled. His account then ran for years, payments being made from time to time. The account was for general supplies. He lived on a part of the land and attended to the whole plantation; that he made an exchange of land with Arch. Griffin for a part of the Linton lands, with Hardy Griffin's consent, for the reason that Hardy Griffin said he could not make a title, but Arch. Griffin could; that some years after this land transaction A. A. Griffin made some statement to him about this trust property, but not at that

time. After the years '65 and '66 accounts were opened with Mrs. Rachel Griffin, W. D. Griffin and A. A. Griffin, individually as well as trustee, and continued for years; that at one time he intimated to A. A. Griffin that he would subject the property for the debt, and that Griffin said that it did not make any difference, that he intended to pay me, " that the trust was not worth a d—n anyhow." This is all that is material of the testimony of this witness.

John M. Beggs, Clerk of the Circuit Court for Madison county, for the defendants. He produces a list of unsettled judgments against A. A. Griffin, from the years 1856 to 1866, inclusive. These judgments are for various amounts, and show that A. A. Griffin was considerably in debt during the time mentioned. The objections taken to this testimony may be divided into two classes: First, as to the competency of some of the witnesses who are parties to the suit when they speak to any transaction or communication between such witness and the person at the time of such examination deceased, agai st the heir-at-law of such deceased person. J. Leroy Gale here is the heir-at-law of J. L. Griffin. She is the defendant whose interests are primarily concerned, and it must be obvious that the testimony of any party to this cause which purports to speak to any transaction or communication between such party and her father, J. L. Griffin, touching the subject matter of this suit, is inadmissible. The statute prohibits the *examination of a party* to such transaction or communication against the heir-at-law. Whether, under the peculiar circumstances of this case, the *examination* of a party as to the transactions and communications between such party and A. A. Griffin is prohibited by the statute, we deem it unnecessary to determine, because, treating the subject as though it was inadmissible, our conclusion is the same.

The next class of objections relate to the character of the testimony itself, such as that there is no evidence as to who was the purchaser of the lands in Georgia; that there is no deed produced; nothing to show in whose name the investment was made; that no precise sum of money is shown to have gone into the Madison county lands.

That these objections exist to the character of the testimony of the plaintiffs is true, but we think that there is sufficient legal evidence here, independent of these objections, to establish the trust and to show, independent of the question whether Mrs. Rachel Griffin had any interest in the lands or not, that the parties have the equitable interest which they claim, to wit: a one-sixth interest in the land.

We think that the only reasonable deduction from the evidence is, that at the death of Andrew Hampton Hardy Griffin and Rachel Griffin were in reduced circumstances, Hardy Griffin having been pursued by debt from State to State and his property sold under judicial process; that the money and the property brought by these parties to Florida belonged to the trust created by the will for the benefit of the grandchildren of Andrew Hampton, the children of Hardy and Rachel Griffin; that the first sale by Linton to Griffin was rescinded after an arbitration, and that the primary cause of it was knowledge by Linton that Hardy Griffin had nothing except property belonging to the trust; that the cash purchase money paid to Linton was derived from the trust fund; that such fact was known to A. A. and J. L. Griffin; that A. A. and J. L. Griffin, at the time of the purchase from Linton, paid no money of their own; that their act was intended by them to be in pursuance of the trust; that the property which they had was small, and that none of it was appropriated to the payment of the trust debt, but that the debt was paid through the cultivation of

the land by the labor of slaves belonging to the trust fund ; that A. A. and J. L. Griffin admitted the investment of the trust fund at the time it was made, and that A. A. Griffin admitted it for years afterwards ; that the general conduct of every member of the family, including the mother of defendant, plaintiff, has been upon the hypothesis of a trust as to this property for many years, and that whatever may have been the nature of casual and thoughtless remarks to others not particularly concerned by A. A. Griffin as to this property the general nature of his acts and admissions as to this property, through a series of years, involve the conclusion that he knew and admitted that the property was neither his nor his brother's, and that all of the adult parties have consented to and had a division of the property based upon the existence of the trust ; have made improvements upon their several properties and have for years occupied them in subordination to the trust, and we think the law of evidence as applicable to the proof here sustains our conclusions. It consists largely of admissions of A. A. and J. L. Griffin sworn to, not by one, but by several disinterested witnesses, and circumstances corroborating those admissions. There is no proof that that the purchase was made on the credit of A. A. and J. L. Griffin, and the evidence discloses not one cent paid by J. L. Griffin on the purchase, nor did any of his property aid in the cultivation of the land by which the debt was paid. Land is not self-productive of the articles by the sale of which this debt was paid. Upon his (J. L. G's.) death, his brother, A. A. Griffin, his administrator, and, as is claimed by J. Leroy Gale, her father's co-tenant in fee, did not claim such interest in J. L. Griffin as his heir now claims. Indeed there was no such claim made by any of the children or the family until after the institution of this suit when it is made by his heir, who has arrived at the age of twenty-one since the in-

stitution of this suit, and the claim is made upon the fact that the deed was absolute, and there is no express trust shown as against her father and without any evidence of any party who knew anything about the trust funds in Georgia or the arbitration resulting in the deed from Linton to A. A. Griffin and her father, or the nature of the contract. Admissions by A. A. and J. L. Griffin sworn to by several disinterested witnesses and corroborated by testimony showing the facts mentioned above, we think is evidence of the highest character. Perry on Trusts, §137, and cases cited to note 3.

The financial condition of persons, who themselves assert, or through whom others assert a purchase in their own right as against those who claim that it is made with trust funds or with funds belonging to them, is a fact to which courts of equity universally give weight in investigations of this character. Such has been the rule from the case of Willis vs. Willis, 2 Atk., 71, in 1740, to this time. In that case, and it was the case of a resulting trust as this is, Lord Hardwicke said, speaking of the statute of frauds: "There is another way of taking a case out of the statute, and that is by admitting parol evidence within the rules laid down in this court to show the trust, from the mean circumstances in the pretended owner of the real estate or inheritance which makes it impossible for him to be the purchaser." Wilkins vs. Stevens, 1 Y. & C., Ch. Ca., 431 ; Lench vs. Lench, 10 Ves., 518 ; Benger vs. Drew, 1 P. Williams, 780 ; Strimpfler vs. Roberts, 18 Pa. State, 283 ; Baumgartner vs. Guessfield, 38 Mo., 36 ; Farrell vs. Lloyd, 69 Penn. State, 239 ; Sayer vs. Frederick, 1 C. E. Green, 205 ; Gascoigne vs. Thwing, 1 Vroom, 366 ; Mitchell vs. O'Neil, 4 Fev., 504.

While the precise amount realized from the trust fund in Georgia and brought to Florida, and the exact amount

of the first payment made to Linton is not established, yet the general facts that the funds brought were trust funds, and that the payment made was from them, is established by the testimony of disinterested parties who knew the circumstances of the parties in Georgia, and when they came to Florida. Mrs. Griffin's testimony is for the most part admissible here.

Upon the merits therefore we think the decree correct.

What has been said disposes of the first, second, seventh, eighth and ninth grounds of appeal. The third ground of appeal is because the complainants ought not to have been allowed at the hearing of the cause upon its merits to amend their bill, so as to present an entirely different cause. We have read the original bill carefully several times, and can perceive no necessity for its amendment. The claim is for the equitable interest of the plaintiffs and the investment of the trust funds with the knowledge of the trust is set forth. The will of Andrew Hampton is set forth, and the estate which they have under it is what they demand. That they made a mistake as to the interest of Mrs. Rachel Griffin, is not material. While their interpretation of the will as to this matter is incorrect, still if the facts set forth entitle them to the relief prayed, it is sufficient. Nor do we think that the amended bill makes a different case. The amendment by adding an allegation that the taking the deed in the name of A. A. and J. L. Griffin was through accident, fraud or mistake, is mere surplusage. Plaintiffs had already stated the facts, and whether it was an accident, fraud or mistake, was a conclusion which could well have been omitted. So, also, whether Mrs. Rachel Griffin did or did not know how the deed was made, was entirely immaterial. Her knowledge as to the form of the deed could neither create or destroy the trust.

The fourth ground is because if the bill is to reform a deed it is not between the proper parties. The bill is not a bill to reform a deed, but to establish an equitable title to the subject matter of the deed and against the deed.

The fifth ground is because the general charges of fraud, accident or mistake, as made in the bill, as amended, are too indefinite to sustain the cause; no specific acts of accident, fraud or mistake are alleged or proven. Such an allegation as this is as a matter of course not good pleading, but where the facts constituting the equity are set up, to state a legal conclusion is unnecessary, and if stated is simply surplusage, unnecessary and immaterial matter.

The sixth ground is because the bill for partition was filed March 21, 1878, the amendments alleging fraud, &c., were made October 4, 1879, both of which were more than twenty-two years after the said deed was executed and the said claim is stale and is barred by the statute of limitations. The case presented by this record is that of a purchase with trust funds and acknowledgement of use of the subject matter as trustee for the time specified. There is nothing adverse here. Those who were and are in possession acknowledge and have always acknowledged the relation and claim of the plaintiffs under the will. The stale claim or the new claim is that of the defendant J. Leroy Gale, who for the first time now denies the existence of the trust which all of her ancestors who knew anything of the matter, including her mother, have acknowledged for over twenty years.

The decree is affirmed.